Exhibit 1

AMERICAN ARBITRATION ASSOCIATION
Commercial Arbitration Tribunal

-----------------------------------------------------------------------X

Pepsico, Inc.,                                        :

                                                      :       Case No. 01-20-0015-8060

                                                      :

                              Claimant,               :

                                                      :

v.                                                    :

                                                      :

Vital Pharmaceuticals, Inc. d/b/a VPX,                :

                                                      :

                              Respondent.             :

-----------------------------------------------------------------------X

**INTERIM ORDER**

This is an arbitration (the "Arbitration") commenced by Claimant Pepsico, Inc.

("Claimant") against Respondent Vital Pharmaceuticals, Inc. d/b/a VPX ("Respondent")

(collectively, the "Parties") regarding the alleged breach of a Distribution Agreement entered

into by the Parties on March 6, 2020 (the "Agreement"). The Emergency Arbitrator has been

appointed pursuant to the Agreement and the Commercial Arbitration Rules of the American

Arbitration Association ("AAA").

**The Present Dispute**

Claimant is a global manufacturer and distributor of food and beverage products.

Sometimes, Claimant agrees to serve as the distributor of products manufactured and sold by

other companies. Respondent is a manufacturer of beverage products. The Parties entered into

the Agreement, pursuant to which Claimant would serve as the exclusive distributor in the

United States of certain products manufactured by Respondent (the "Products"), and Respondent

would pay Claimant for such distribution services.

In connection with the Agreement, Claimant invested in infrastructure, including

acquiring warehousing equipment and vehicles. Claimant also paid ███████ to Respondent

to buy out its existing distributors, in order to allow Respondent to transition the nationwide

distribution of its products to Claimant, as memorialized in a Channel Agreement, dated March

6, 2020.

Respondent terminated the Agreement, without cause, pursuant to Section 3.2(a) of the

Agreement, by delivery of a Notice of Termination, dated October 23, 2020 (the "Notice of

Termination"). Claimant alleges that Respondent has breached the Agreement by failing to

adhere to its contractual obligations for an additional three-year notice period (the "Notice Period"), as is required following the Notice of Termination of the Agreement.

Claimant commenced this Arbitration by filing with the AAA a Demand for Arbitration, dated November 23, 2020, in which Claimant requests (1) a Declaratory Judgment that Claimant is the exclusive distributor of the Products for at least three years because Respondent has not terminated the Agreement with cause; (2) a Declaratory Judgment that Respondent has breached the Agreement and failed to cure the breaches; (3) a Declaratory Judgment that Respondent owes Claimant the "Company Separation Amount;" (4) Damages for breach of the Agreement infringement of Claimant's exclusive distribution rights; (5) Damages for breach of the Agreement   violation of the confidentiality provision; and (6) Specific Performance Respondent must perform its obligations under the Agreement until at least October 24, 2023, *i.e.*, during the Notice Period, because Respondent did not terminate the Agreement with cause.

Respondent has not yet filed a formal answer or other response to Claimant's Demand for Arbitration. However, it is apparent that Respondent denies the material allegations in the Demand for Arbitration, including that it has breached the Agreement, and contests that Claimant is entitled to any of the relief that it seeks in this Arbitration.

### Claimant's Application for Emergency and Interim Relief

Simultaneous with the commencement of this Arbitration, Claimant filed an Application for Emergency and Interim Relief with the AAA. The relief that Claimant seeks in its Application is set forth in its "[Proposed] Order Granting Claimant's Application for Emergency and Interim Relief:"

2

(1) that Respondent cease any and all actions, directly or indirectly, through its personnel, contractors, or other representatives, to "(a) sell to customers for whom [Claimant] has exclusive sales and distribution rights, (b) distribute Bang-branded products anywhere in the Territory, as defined in the Agreement, other than through [Claimant], or (c) 'take back' or 'transition' any territories or customers away from [Claimant], unless otherwise agreed to in writing by [Claimant];"

(2) that Respondent and its CEO "shall not release, directly or indirectly, any of the following: (a) any "press releases, publicity statements or other information regarding this Agreement,' including any Tweets or other statements on all the various social media platforms leveraged by [Respondent], its representatives, or Mr. Owoc, 'without the prior written approval of' [Claimant], (b) any 'non-public information concerning [Claimant's] respective business operations;' (c) "the existence of this Agreement or any prices or terms of purchase under this Agreement to any person or entity;' or (d) disparaging statements regarding [Claimant] or its performance under the Agreement, or false statements claiming that [Claimant] no longer has distribution rights for Bang-branded products under the Agreement;"

(3) "[Respondent] and its CEO, Mr. Owoc, shall publicly retract press releases and social media posts that violate Section 9.1 of the Agreement, including the November 17, 2020 press release issued by [Respondent] and November 17, 2020 Tweet from Mr. Owoc concerning the Agreement;"

(4) "[Respondent] shall, within 14 business days, post a bond with AAA or other custodian agreed to by the parties equal to ▮▮▮▮▮▮, the estimated buy-out fee

that [Respondent] is required to pay to [Claimant] as calculated in [Claimant's]

November 20, 2020 notice under Section 3.2(a)(i)(c) of the Agreement;"

(5) "Pursuant to Section 9.1., all filings, arguments, evidence, and other information in

this arbitration shall be kept confidential by the parties, except to the extent permitted

under the Agreement or as needed to enter or enforce this award;" and

(6) "[Respondent] is bound by Section 9.11 of the Agreement, which requires all disputes

to be resolved through arbitration."

Respondent opposes the Application in its entirety, based on its position that it has not

breached the Agreement, and that Claimant is not entitled to any of the relief that it seeks.

In support of its Application, Claimant submitted an Application for Emergency and

Interim Relief, with exhibits, dated November 23, 2020; Declaration of Eric Hanson, with

exhibits, dated November 23, 2020; Declaration of Elizabeth Earl, with exhibits, dated

November 23, 2020; Declaration of Shay Hobby, with exhibits, dated November 23, 2020;

Claimant's Supplemental Exhibits in Support of its Application for Emergency and Interim

Relief, with exhibits, dated November 24, 2020; letter from Claimant's counsel, with exhibit,

dated November 25, 2020; letter from Claimant's counsel, with exhibits, dated November 25,

2020; letter from Claimant's counsel, with exhibits, dated December 1, 2020; letter from

Claimant's counsel, with exhibit, dated December 2, 2020; letter from Claimant's counsel, dated

December 4, 2020; letter from Claimant's counsel, with exhibit, dated December 5, 2020; and

[Proposed] Order Granting Claimant's Application for Emergency and Interim Relief.

In opposition to Claimant's Application, Respondent submitted Respondent's Opposition

to Claimant's Application for Emergency and Injunctive Relief, dated December 2, 2020;

Declaration of Gene Bukovi, with exhibits, dated December 1, 2020; Declaration of Mike

4

Sweeney, with exhibit, dated December 2, 2020; Declaration of John O'Meara, with exhibits, dated November 25, 2020; Declaration of Joshua Griffin, with exhibit, dated November 25, 2020; Declaration of Sam Gali, dated November 25, 2020; and email from Respondent's counsel, dated December 6, 2020.

A hearing was held via video conference on December 3, 2020, during which oral argument was presented by Andrew S. Tulumello of Gibson, Dunn & Crutcher LLP, counsel for Claimant, and Daniel M. Janssen of Quarles & Brady LLP, counsel for Respondent. Also attending the hearing were other attorneys from counsel's law firms, representatives of the Parties and David C. Singer, the Emergency Arbitrator.

### Applicable Law and Dispute Resolution Provisions

Dispute resolution provisions are set forth in Section 9.11 of the Agreement and provide, in relevant part:



Accordingly, New York law is the applicable law, and the Commercial Arbitration Rules of the AAA govern this Arbitration.

Rule 38 of the Commercial Arbitration Rules of the AAA provides, in relevant part:

"R-38. Emergency Measures of Protection . . . (d) . . . The emergency arbitrator shall have the authority vested in the tribunal under Rule 7, including the authority to rule on her/his own jurisdiction, and shall resolve any disputes over the applicability of this Rule 38." No objection has been raised by either of the Parties to the jurisdiction of the Emergency Arbitrator. Accordingly, the Emergency Arbitrator has the authority to rule on Claimant's Application for Emergency and Interim Relief.

### Analysis and Conclusions

Commercial Arbitration Rule 38 of the AAA states, in relevant part:

R-38. Emergency Measures of Protection

(e) If after consideration the emergency arbitrator is satisfied that the party seeking the emergency relief has shown that immediate and irreparable loss or damage shall result in the absence of emergency relief, and that such party is entitled to such relief, the emergency arbitrator may enter an interim order or award granting the relief and stating the reason therefore.

An emergency arbitrator has broad discretion and may choose from legal and equitable remedies to fashion relief that will immediately address a party's loss or damage. *ReliaStar Life Ins. Co. of N.Y. v. EMC Nat'l Life Co.*, 564 F.3d 81 (2d Cir. 2009). The emergency arbitrator may fashion relief that is necessary to preserve the party's ability to obtain meaningful relief in the arbitration, such that the party is unable "to alter irreversibly the status quo before the arbitrators are able to render a decision in the dispute." *Blumenthal v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 910 F.2d 1049, 1053 (2d Cir. 1990).

Claimant's Entitlement to the Relief Sought

The key relevant language in the Agreement includes Section 3.1, which states:

████████████████████████ ████████  In other words, the Agreement was intended by

the Parties to last indefinitely, unless terminated by one of the Parties.

Section 3.2(a) of the Agreement states.████████████



Section 2.3(b) of the Agreement states as follows:



Section 9.11 of the Agreement states, in relevant part:

████████████████████.

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████.

Section 3.2(a) is clear on its face. It unambiguously provides that the Agreement does not

terminate until three years after a written notice of termination in received by the other Party. In this case, the Notice of Termination was received by Claimant on October 23, 2020. Therefore, the Agreement terminates on October 24, 2023.

Because Section 3.2(a) is unambiguous, extrinsic evidence is not permitted and should not be considered. *See Omni Quartz, Ltd. V. CVS Corp.,* 287 F.3d 61, 64 (2d Cir. 2002). Indeed, even if extrinsic evidence were considered, such evidence would lead to the same conclusion. For example, the meaning of Section 3.2(a) is confirmed in Respondent's Notice of Termination: "Please be advised that, pursuant to Section 3.2(a) of the Agreement, any and all relationships between [Respondent] and [Claimant] ('Distributor'), including but not limited to those described in the Agreement, shall terminate no later than October 24, 2023 (the 'Notice Period')."

The sections of the Agreement that Respondent relies upon in its opposition    in particular, Section 3.2(c) -- do not alter or contradict the meaning of section 3.2(a). In its reliance upon those provisions, Respondent conflates the phrases "expiration or termination of this Agreement" and "the effective date of expiration or termination" with the date of the Notice of Termination. However, they are not the same thing    the Notice of Termination is dated and was delivered to Claimant on October 23, 2020; the expiration or termination of the Agreement, and the effective date of expiration or termination of the Agreement, is October 24, 2023.

Respondent appears to want for itself the best of both options: the ability to replace distributors immediately to the extent it desires and is able to do so (as though the Agreement was terminated with cause) **and** the option to replace distributors more gradually over three years, to the extent it is not able to do so immediately (as though the Agreement was terminated

8

without cause). All the while, Claimant is required to perform its obligations under the Agreement throughout the three-year Notice Period.

However, the Agreement allowed Respondent to choose one of the two options, not both. Based upon Respondent's decision to terminate the Agreement without cause, Respondent cannot replace Claimant as its exclusive distributor until the three-year Notice Period expires on October 24, 2023.

Respondent argues that is unreasonable to expect it to replace its distribution network overnight upon the expiration of the Notice Period. However, nothing in the Agreement appears to prevent Respondent from making arrangements during the Notice Period to replace Claimant as its exclusive distributor upon expiration of the Notice Period. Moreover, Section 3.2(c)(iii) of the Agreement provides for the Parties potentially to continue to do business together subsequent to termination of the Agreement.

Therefore, the Emergency concludes that Claimant is likely entitled to the relief that it seeks in this Arbitration, namely, a declaration that Claimant remains Respondent's exclusive distributor pursuant to the Agreement through October 24, 2023.

Claimant's Assertions of Immediate and Irreparable Loss or Damage in the Absence of Emergency Relief

Respondent argues that Claimant can establish immediate and irreparable loss or damage only upon a showing that its very existence is threatened. In fact, however, the law provides that a party can establish irreparable harm even when its very existence is not threatened. *See Caruso Mgmt. Ltd. v. Int'l Council of Shopping Centers*, 2019 WL 1949801, at 6 (S.D.N.Y. April 18, 2019)("… there are certain circumstances where a movant can demonstrate irreparable harm

even if its existence or a substantial portion of the relevant business is not threatened."); *See also*

*Nat'l Kitchen Prods., Inc. v. Kelmort Trading & Co.*, No. 91-cv-7540, 1992 WL 18805, at \*2

(S.D.N.Y. January 24, 1992)("Nor can it be the case that nothing less will suffice than a showing

that, failing entry of an order of injunction, a business entity's very existence will be necessarily

and utterly destroyed.").

Respondent further argues that Claimant cannot establish irreparable harm because, even

if the arbitration Tribunal finds against Respondent on liability, any harm that the Tribunal

determines Claimant has sustained can be satisfied by the payment of monetary damages for

breach of contract. In making this argument, Respondent focuses on Section 3.2(a)(i)d. of the

Agreement and Schedule 8 attached to the Agreement. Those provisions set forth a formula that,

following termination of the Agreement without cause, if Respondent's market share for the

Products declines during the Notice Period, the ██████ ████████████ that will be paid

to Claimant is increased. This, according to Respondent, constitutes the monetary damages that

the Parties provided that Claimant would receive if Respondent moved its distribution from

Claimant to other distributors during the Notice Period. However, the more plausible explanation

for the formula regarding the Company Separation Amount is that, following notice of

termination without cause, it provides an incentive for Respondent to stay committed to the

Products and Claimant's distribution of them during the Notice Period.

Moreover, the damages claimed by Claimant are not limited to lost profits or other solely monetary loss. Applicable case law establishes that the harm that Claimant asserts it has already suffered, and will continue to suffer, cannot be adequately satisfied by the payment of monetary damages. In *Reuters Ltd. v. United Press Int'l*, 903 F.2d 904 (2d Cir. 1990), Reuters terminated its service of supplying newspictures to UPI, which UPI in turn supplied to its customers. The court discussed that "terminating the delivery of a unique product to a distributor whose customers expect and rely on the distributor for a continuous supply of that product almost inevitably creates irreparable damage to the good will of the distributor." *Id*. at 907-08. The court concluded: "We agree that the actual loss of . . . services is not imminent. Yet even a speculative loss may cause immediate irreparable harm to UPI's good will."  *Id*. at 908. "[I]n cases where a preliminary injunction has issued to prevent a product source from suspending delivery to a distributor, the irreparable harm has often consisted of the loss of customers and the competitive disadvantage that resulted from a distributor's inability to supply its customers with the terminated product." *Id*. at 909. *See also Nat'l Kitchen Prods., Inc., supra*. At 2 (". . . it appears clear that a distributor threatened with serious harm to its ability to compete, which harm is not fairly compensable in money damages, may turn to equity for protection from the impending incalculable loss of reputation and good will.").

In *Guinness-Harp Corp. v. Jos. Schlitz Brewing Co.*, 613 F.2d 468 (2d Cir. 1980), the parties entered into an agreement pursuant to which Guinness was the distributor of certain Schlitz products. Schlitz eventually terminated the agreement. The Second Circuit affirmed a preliminary injunction that enforced the status quo pending arbitration, stating that losing the right to distribute "for the period pending completion of the arbitration is likely to disrupt Guinness' business and injure its reputation, consequences for which compensation would be difficult, if not impossible, to determine." *Id.* at 473. The court explained that an injunction pending arbitration was proper because, under the agreement: "Guinness did not simply agree to arbitration in general; it agreed to arbitration that was to take place before the status quo between the parties had been altered." *Id.* at 472. Similarly, in the present case, Section 9.11(d) of the Agreement provides: █████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████

In the present case, Respondent argues that Claimant's assertions of damage to its good will, reputation in the marketplace and relationships with its customers are based on speculation, hearsay and conjecture. However, the evidence submitted in support of Claimant's Application establishes actual harm.

> *Respondent already has engaged in efforts in Texas and Florida to convert its distribution network away from Claimant, including selling or giving away Products directly to customers in Claimant's exclusive territory. [Hanson Decl., par. 18; Earl Decl., par. 5; Hobby Decl. par. 5]

\* Respondent's representatives have told customers that Respondent has regained Claimant's distribution rights and not to purchase Products from Claimant. [Earl Decl., pars. 6, 9; Hobby Decl., pars 6-8]

\* Respondent issued a press release on November 17, 2020, stating that Respondent had terminated Claimant as its exclusive distributor (including: "PepsiCo, you're fired."). [Application, Ex. 7]

\* Respondent's CEO sent a tweet on November 17, 2020, stating: "[Respondent] has terminated the distribution contract with [Respondent] effective immediately." [Application, Ex. 8]

\*Respondent's EVP of Sales sent a letter, dated November 23, 2020, to "Dear Valued Partner" stating: "Last week [Respondent] declared an end to its partnership with [Claimant], effective immediately. . . [Claimant] is no longer an exclusive distributor. As such, [Respondent] is entitled to develop distribution channels with trustworthy partners as we deem fit for our own brand. That process has already started and will continue in earnest." Claimant's Supplemental Exhibits in support of its Application for Emergency and Interim Relief, Ex. A.

\* Respondent's SVP of Sales sent a letter, dated November 23, 2020, to "Dear Retail Partner" stating: "I want to provide additional information regarding [Respondent's] recent press release (attached) announcing its termination of its exclusive distribution partnership with [Claimant], effective October 23, 2020. . . . The transition has already started . . ." Claimant's Supplemental Exhibits in support of its Application for Emergency and Interim Relief, Ex. B.

\* Respondent issued a press release on November 25, 2020, subsequent to the commencement of this arbitration and filing of Claimant's Application, stating: "[Claimant] has been legally terminated by [Respondent] over a month ago. . . Make no mistake   [Claimant] has been legally terminated! [Claimant] is no longer [Respondent's] exclusive distributor. All retailers and third parties are legally free to purchase direct from [Respondent] and its extensive network of authorized distributors. Again, [Claimant] is no longer legally [Respondent's] exclusive distributor." Counsel letter, dated November 25, 2020, Ex. A.

\*Respondent reissued the November 25, 2020 press release on December 1, 2020. Counsel letter, dated   December 1, 2020, Ex. B.

\*On December 2, 2020, Claimant learned from Costco, one of its major customers, that representatives of Respondent had requested that Respondent take over distribution of the Products for Costco in Texas and Florida. It was reported to Claimant that the Costco customer was  frustrated by the conflicting information that it was receiving from Claimant and Respondent and concerned with Costco's ability to source the Products. Counsel letter, dated December 2, 2020, Ex. A.

\* Respondent's CEO gave an interview (answering written question by email) that was published in *Beverage Digest*, entitled: Exclusive Q&A: Bang CEO Offers View of PepsiCo's Performance. "Terminated Means Terminated." In the published interview, Respondent's CEO stated:

Pepsi's termination was effective immediately over one month ago. Pepsi being fired and their contract terminated while 'contending' that nothing changes is absurd. Pepsi has been legally terminated. . . . Termination of Bang Energy's exclusive distribution agreement was and is effective immediately on the effective date thereon over one month ago. . . . Furthermore, we have also brought additional best-in-class distributors on board to strengthen our current distributor network. . . . we just sat around the campfire holding hands singing kumbaya hoping Kirk Tanner, Jim Lee and Hugh Johnston would execute on our joint business plan and execute on Pepsi's grandiose promises while letting our business be intentionally destroyed [sarcasm intended] . . .The only fragmented distribution system retailers have to worry about is the fruitless and feckless Pepsi distribution system. . . . If you think we were foolish enough to put all our trust in Pepsi without having a backup plan, you've simply may have lost your mind! . . . Pepsi CEO, Kirk Tanner, CFO Hugh Johnston and Jim Lee are professional data spin masters. They're so used to spinning the data, that I believe they actually convince themselves that their delusions are real. This prompted me to send an email to Kirk Tanner and Hugh Johnston asking: 'How does it feel to be so pathetic and feckless and wallow aimlessly and habitually in the stench of sub mediocrity? . . . If you need further insight into the extreme dysfunction at Pepsi, look no further than Pepsi's purchase of Rockstar. . . . Any retailers who need indemnification from Pepsi's threats and harassment, please contact Bang Energy. Pepsi has been fired! Pepsi has been sent a letter of termination which you can access by clicking this link . . .

Based on the above, it is clear that Respondent is violating the Agreement, including

Sections 1.1, 2.3(b), 3.2(a), 9.1 and 9.11 thereof. According to Claimant, Respondent's direct

sales or giveaways unfairly undercut Claimant's pricing. The misinformation that Respondent is

conveying has created substantial confusion in the marketplace for retailers and sub-distributors,

causing some to question whether they should continue to purchase the Products from

Respondent or Claimant. Respondent's interference with its exclusive distribution renders

Claimant unable to manage its distribution because of uncertainty regarding whether customers

will choose to purchase the Products from Claimant, Respondent directly or a new distributor

appointed by Respondent. Respondent's behavior puts at risk Claimant's relationships with its

customers. [ Hanson Decl., pars. 20-26; Earl Decl., pars. 8-12; Hobby Decl., pars. 9-11] This is

not merely the hypothetical possibility of harm to Claimant in the future, but events that already

have occurred within the relatively short period of time following the date of the Notice of Termination.

In the present case, Respondent's CEO has disparaged Claimant and its corporate officers -- including publicly through press releases and at least one interview -- even during the pendency of Claimant's Application for Emergency and Interim Relief. This is in breach of Section 2.3(b)(ii) of the Agreement ███████████████████████

███████████████████████████████████████████

███████████████████████ Respondent's CEO's ongoing and public efforts can cause irreparable harm to reputations, good will and relationships with customers and others in the industry. The damage to Claimant's good will, reputation and relationships cannot be adequately addressed with a monetary payment in the future for potential lost profits. *Xelus, Inc. v. Servigistics*, 371 F.Supp.2d 387, 388 (W.D.N.Y. 2005)(disparaging remarks could cause irreparable harm to reputation, goodwill and business opportunities).

Respondent argues that there is no proof of actual financial loss contained in Claimant's Application. However, the fact that the harm to Claimant may be unquantifiable at this time does not mean that it does not exist or that is not immediate and irreparable. Indeed the actions and public statements of Respondent and its CEO have exacerbated the untenable circumstances for the Parties, as well as for retailers and others involved in the distribution of the Products, and they should not be rewarded for their actions because of the inability to quantify damages at this time.

Therefore, the Emergency Arbitrator is satisfied that Claimant has made a sufficient showing that it would suffer immediate and irreparable loss or damage in the absence of emergency relief.

The purpose of an injunction is to preserve the status quo ante, "*i.e.*, the situation that existed between the parties immediately prior to the events that precipitated the dispute." *Asa v. Pictometry Intern Corp.*, 757 F.Supp.2d 238, 243 (W.D.N.Y. 2010). The "'[s]tatus quo' to be preserved by a preliminary injunction is the last actual, peaceable uncontested status which preceded the pending controversy." *LaRouche v. Kezer*, 20 F.3d 68,74 n.7 (2d Cir. 1994);  *N. Am. Soccer League, LLC v. US Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018)("Because the proposed injunction's effect on the status quo drives the standard, we must ascertain the status quo   that is, 'the last actual, peaceable uncontested status which preceded the pending controversy.'"). *Christa McAuliffe Intermediate Sch. PTO, Inc. v. de Blasio*, 364 F.Supp.3d 253, 274-75 (S.D.N.Y. 2019), aff'd, 788 F. App'x 85 (2d Cir. 2019).

The Parties have different views of the status quo ante. Although the Parties agree that the status quo ante follows the termination of the Agreement by Respondent without cause on October 23, 2020, each Party argues that the status that is restored should be according to its interpretation of the current rights and obligations of the Parties under the Agreement.

In this case, the appropriate status quo ante exists with Claimant serving as the exclusive distributor for Respondent in the United States, consistent with the Emergency Arbitrator's understanding of the meaning of Section 3.2(a) of the Agreement.

Other arguments and contentions of the Parties regarding this Application that are not expressly addressed herein have been considered by the Emergency Arbitrator. Unless they are

adopted herein, they have been found to be either consistent with the conclusions reached herein or without merit.

### Emergency and Interim Relief Requested by Claimant

The Emergency Arbitrator considers the specific emergency and interim relief that Claimant requests in its Application:

1. Claimant requests that the Emergency Arbitrator order that Respondent cease any and all actions, directly or indirectly, through its personnel, contractors, or other representatives, to (a) sell to customers for whom Claimant has exclusive sales and distribution rights, (b) distribute Bang-branded products anywhere in the Territory, as defined in the Agreement, other than through Claimant, or (c) take back or transition any territories or customers away from Claimant, unless otherwise agreed to in writing by Claimant. Claimant's request is granted.

2. Claimant requests that the Emergency Arbitrator order that Respondent and its CEO shall not release, directly or indirectly, any of the following: (a) any press releases, publicity statements or other information regarding this Agreement, including any Tweets or other statements on all the various social media platforms leveraged by Respondent, its representatives, or Mr. Owoc, without the prior written approval of Claimant, (b) any non-public information concerning Claimant's respective business operations; (c) the existence of this Agreement or any prices or terms of purchase under this Agreement to any person or entity; or (d) disparaging statements regarding Claimant or its performance under the Agreement, or false statements claiming that Claimant no longer has distribution rights for Bang-branded products under the Agreement. This request essentially is to enforce the terms of the Agreement; therefore, Claimant's request is granted to the extent that Respondent is ordered to abide by the

terms of the Agreement, including but not limited to Sections 2.3 (b) and 9.1 thereof, during the Notice Period.

3. Claimant requests that the Emergency Arbitrator order that Respondent and its CEO, Mr. Owoc, shall publicly retract press releases and social media posts that violate Section 9.1 of the Agreement, including the November 17, 2020 press release issued by Respondent and November 17, 2020 Tweet from Mr. Owoc concerning the Agreement. Again, Claimant's request is granted to the extent that Respondent is ordered to abide by the terms of the Agreement, including but not limited to Sections 2.3(b) and 9.1 thereof, during the Notice Period.

4. Claimant requests that the Emergency Arbitrator order that Respondent shall, within 14 business days, post a bond with the AAA or other custodian agreed to by the parties equal to ███████████, the estimated buy-out fee that Respondent is required to pay Claimant as calculated in Claimant's November 20, 2020 notice under Section 3.2(a)(i)(c) of the Agreement. Claimant's request is denied. Claimant has not set forth facts in the Application regarding the imminent dissipation of Respondent's assets or other activity that would establish irreparable harm in the absence of the immediate posting of a bond. *See Westchester Fire Insurance Company v. Denovo Constructors*, 177 F.Supp.3d 810 (S.D.N.Y. 2016)("Courts in this circuit have granted preliminary injunctions in cases seeking monetary relief if the 'non-movant's assets may be dissipated before final relief can be granted, or where the non-movant threatens to remove its assets from the court's jurisdiction.'") Moreover, pursuant to Section 3.2(a)(i)b. of the Agreement, ████████████████████████████████████████ ████████████████████████████ *i.e.*, not later than during January 2024. Claimant,

therefore, will have the opportunity to request, if the facts support such an application, that the arbitration Tribunal, once it is constituted, order that a bond be posted.

5. Claimant requests that the Emergency Arbitrator order that, pursuant to Section 9.1 of the Agreement, all filings, arguments, evidence, and other information in this arbitration shall be kept confidential by the parties, except to the extent permitted under the Agreement or as needed to enter or enforce this award. Claimant's request is denied. Section 9.1 of the Agreement relates to information defined as ███████████████ In contrast, "all filings, arguments, evidence, and other information in this arbitration" are not necessarily confidential; arbitration is not inherently a confidential process. The Parties are free to enter into a confidentiality agreement or stipulation that provides for the confidentiality of documents or other materials and information exchanged or produced by the Parties or others, or any portion thereof, in the Arbitration.

6. Claimant requests that the Emergency Arbitrator order that Respondent is bound by Section 9.11 of the Agreement, which requires all disputes to be resolved through arbitration. Claimant's request is denied. Such request was made prior to Respondent's voluntary participation in this arbitration, and it is therefore unnecessary at this time due to Respondent's participation. Moreover, Section 9.11 addresses issues regarding the potential for seeking relief from a court as appropriate. Respondent's obligations to adhere to the provisions of Section 9.11 are subsumed within its obligations to adhere to its obligations under the Agreement. Finally, Claimant has not established that it will suffer irreparable harm in the event that Respondent does not participate in the Arbitration.

## Interim Order

The Emergency Arbitrator hereby issues the following Interim Order:

1. Respondent shall cease any and all actions, directly or indirectly through its personnel, contractors, or other representatives, to (a) sell to customers for whom Claimant has exclusive sales and distribution rights, (b) distribute the Products anywhere in the Territory, as defined in the Agreement, other than through Claimant, or (c) "take back" or "transition" any territories or customers away from Claimant, unless otherwise agreed to in writing by Claimant.

2. Respondent shall abide by the terms of the Agreement, including but not limited to Sections 2.3(b) and 9.1 thereof, during the Notice Period.

3. All other claims, counterclaims, defenses, set-offs, issues and questions properly submitted to this Arbitration, other than the issues decided in this Interim Order, remain open in this Arbitration, and no decision is made as to them in this Interim Order.

4. This Interim Order will remain in full force and effect until such time as a superseding Order or Award is issued by the arbitration Tribunal in this Arbitration.

December 7, 2020____
Date

David C. Singer, Esq.
Emergency Arbitrator

I, David C. Singer, do hereby affirm upon my oath as Emergency Arbitrator that I am the individual described in and who executed the foregoing instrument, which is the Interim Order.

December 7, 2020____
Date

David C. Singer, Esq.,
Emergency Arbitrator

21